**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UBIFUNSTUDIO CO., LTD., | |
|      Plaintiff, | |
| v. | Case No.: 1:25-cv-3543 |
| THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A HERETO, | |
|      Defendants. | |

**COMPLAINT**

Plaintiff Ubifunstudio Co., Ltd. ("UbiFun" or "Plaintiff") brings this action against the Individuals, Corporations, Limited Liability Companies, Partnerships and Unincorporated Associations identified in Schedule A attached hereto (collectively, "Defendants")[1]. In support of this Complaint, Plaintiff alleges as follows:

## I.  JURISDICTION AND VENUE

1.  This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

2.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants as each of the Defendants directly targets

---

[1] Plaintiff has served subpoenas under 17 U.S.C. § 512(h) of the Digital Millennium Copyright Act (DMCA) to Cloudflare Inc. and OVH US LLC in order to obtain the identities of Defendants. Plaintiff intends to amend its Complaint once this information is known.

1

consumers in the United States, including Illinois, through at least the fully interactive commercial internet websites operating under the Defendant aliases and/or the online accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Websites"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive internet websites through which Illinois residents can purchase products bearing infringing versions of Plaintiff's copyrighted works.

3.      Each of the Defendants has targeted Illinois residents by operating online stores that offer products to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold and/or otherwise distributed products bearing infringing versions of Plaintiff's federally registered copyrighted works to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## II.      INTRODUCTION

4.      Plaintiff, UbiFun, is the owner of the federal copyright registrations that protect the creative content of Plaintiff's software, images, and illustrations. UbiFun is a leading international developer and publisher of a variety of different genres of video games, including Massively Multiplayer Online RPG (MMORPG), for multiple personal computer platforms, and developing mobile device platforms.

5.      Since its founding in 2002, UbiFun has developed and published numerous titles that have achieved worldwide commercial success, such as Sky Hero Duribun for Kakao, Hoola, MatPoker, Low Baduki, Passionate Matgo, and Dekaron (the "UbiFun Works").

6.      This action has been filed by Plaintiff to combat online copyright infringers who trade upon Plaintiff's reputation, goodwill, and valuable copyrights by selling, offering for sale,

copying, and/or distributing products in connection with Plaintiff's copyrighted images, illustrations, and software. In addition, the Defendants are selling, offering for sale, copying, and/or distributing unauthorized products that are based on and derived from the copyrighted subject matter of Plaintiff's protected works.

7.      Plaintiff has filed a federal pending trademark registration, Serial No. 98561698 for the standard character mark, "Dekaron." UbiFun is also the owner of the United States Trademark Registration Nos. 7159507 for the standard character mark "Dekaron Coin," and 7159503 for the standard character mark "Dekaron Token." Finally, Plaintiff is the owner of the United States Copyright Registration No. TX 0009-436-663 for the Computer File for "Dekaron" and Korean Copyright Registration No. S-2005-001386 for the Computer Program for "Dekaron" (collectively, the "UbiFun Works"). Registrations for the UbiFun Works (the "Trademark and Copyright Registrations") are attached hereto as Exhibits 1-5.  Upon information and belief, the copyrights have an effective date that predates the Defendants' acts of copyright infringement.

8.      In an effort to illegally profit from the creative content of the UbiFun Works, Defendants have created numerous Defendant Internet Websites and designed them to appear to be selling and/or distributing authorized products.

9.      Plaintiff has been and continues to be irreparably harmed through loss of control over Plaintiff's reputation, goodwill, ability to license, and the quality of goods featuring the UbiFun Works.

10.     Plaintiff's investigation shows that the telltale signs of an illegal piracy ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Internet Websites that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a company that appears to be legitimate is used, online research

shows that there is no known address for the company. Thus, the Defendant Internet Websites are using fake online storefronts designed to appear to be selling, offering for sale, and/or distributing genuine UbiFun software ("UbiFun Products"), while selling, offering for sale, and/or distributing inferior imitations and/or derivatives of Plaintiff's UbiFun Products. The Defendant Internet Websites also share unique identifiers, such as design elements and similarities of the infringing products offered for sale, establishing a logical relationship between them, and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal piracy operation. Plaintiff is forced to file this action to combat Defendants' infringement of Plaintiff's UbiFun Works, as well as to protect unknowing consumers from purchasing unauthorized UbiFun Products over the internet.

11.     This Court has personal jurisdiction over each Defendant, because each Defendant conducts significant business in Illinois and in this judicial district. Furthermore, the acts and events giving rise to this lawsuit were undertaken in Illinois and in this judicial district. In addition, each Defendant has offered to sell, sold, and/or distributed infringing products into this judicial district.

### III.     THE PLAINTIFF

12.     UbiFun is a company incorporated in South Korea. Its principal place of business is located at Marine Bldg, 529, Second Floor, Nonhyeon-ro, Gangnam-gu, Seoul, South Korea.

13.     UbiFun is a leading international developer and publisher of video games. For over a decade, UbiFun has been operating as an online platform housing various types of personal computer based online games, including board games and online RPGs. UbiFun itself conducts

the development and service operations of these games, and is developing a mobile game platform along with additional genres of mobile games. Since its founding in 2002, UbiFun has developed and published numerous titles that have achieved global commercial success, such as Sky Hero Duribun for Kakao, Hoola, MatPoker, Low Baduki, Passionate Matgo, and Dekaron.

14.     Dekaron is a 3-D fantasy massively multiplayer online role-playing game (*i.e.*, "MMORPG") in which players undertake missions through in-game heroes to prevent the resurrection of the sealed "Karon." The game features a dark and intense atmosphere, with combat mechanics and extreme action. UbiFun has operated the Dekaron game since 2013, since then, the game has been played internationally, including in Europe and North America.



*See Dekaron*, www.dekaron.co.kr.



*See Dekaron,* https://dekaron.ubifungames.com/

15. UbiFun is the owner of the Trademark and Copyright Registrations (including a pending trademark registration) that protect the creative content of the UbiFun Works. UbiFun has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the UbiFun Works. As a result, products associated with the UbiFun Works are recognized and exclusively associated by consumers, the public, and the trade as products authorized by Plaintiff as the UbiFun Products.

16. Plaintiff is the owner of United States and Korean Trademark and Copyright Registrations that cover the UbiFun Works. The Trademark and Copyright Registrations are valid,

subsisting, and in full force and effect. True and correct copies of registration certificates for the UbiFun Works are attached hereto as Exhibits 1-5.

17.     In an effort to illegally profit from the creative content of the UbiFun Works, Defendants have created and offered for sale software products on various online websites that infringe UbiFun Works.

18.     Plaintiff has invested substantial time, money, and effort in building up and developing consumer awareness, goodwill, and recognition in the UbiFun Works.

19.     The success of the UbiFun Works is due in large part to Plaintiff's marketing, promotional, and distribution efforts.

20.     As a result of Plaintiff's efforts, the quality of the UbiFun Products, the promotional efforts for Plaintiff's products and designs, press and media coverage, and social media coverage, members of the public have become familiar with the UbiFun Works and associate them exclusively with Plaintiff.

21.     Plaintiff has made efforts to protect Plaintiff's interests in and to the UbiFun Works. No one other than Plaintiff and Plaintiff's licensees are authorized to manufacture, import, export, advertise, create derivative works, offer for sale, or sell any goods utilizing the UbiFun Works without the express written permission of Plaintiff.

### IV.    THE DEFENDANTS

22.     Defendants are individuals and business entities who, upon information and belief, reside in Texas and/or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this judicial district, through the operation of the fully interactive commercial websites and online websites operating under the Defendant Internet Websites. Each Defendant targets the United States, including Illinois, and has offered to sell and,

on information and belief, has sold and continues to sell illegal Infringing Products to consumers within the United States, including Illinois and in this judicial district.



*See Dekaron Rising*, https://dekaron-rising.com/



*See Tempest Dekaron,* [https://tempestdekaron.com/](https://tempestdekaron.com/).



*See Neptune Dekaron*, https://neptunedekaron.eu/.

## V. DEFENDANTS' UNLAWFUL CONDUCT

23.     The success of the UbiFun Works has resulted in significant copying of the creative content protected by Plaintiff's copyright and trademark registrations. Plaintiff has identified numerous fully interactive websites and listings on various platforms. Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on information and belief, has sold and continues to sell infringing products that violate Plaintiff's intellectual property rights in the UbiFun Works ("Infringing Products") to consumers within the United States, including the State of Illinois.

24.     Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Websites so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine UbiFun Products.

25.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the UbiFun Works, including Plaintiff's exclusive right to use and license such intellectual property and the goodwill associated therewith.

26.     The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken by Plaintiff since availing itself of takedown procedures to remove infringing products would be an ineffective and endless game of whack-a-mole against the mass piracy that is occurring over the internet. Sadly, a swarm of infringers have decided to trade upon Plaintiff's reputation, goodwill, and valuable copyrights and trademarks by selling and/or offering for sale products in connection with Plaintiff's illustrations, and images. The aggregated effect of the mass piracy that is taking place

has overwhelmed Plaintiff and Plaintiff's ability to police Plaintiff's rights against the hundreds of anonymous defendants who are selling illegal infringing products at prices below an original.

27.     To be able to offer the infringing products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising, and selling products online requires an economy of scale only achievable through a cooperative effort throughout the supply chain. The Department of Homeland Security ("DHS") reports that infringers act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal pirating network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks. **The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.**
>                                            . . .
> Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.
>                                            . . .
> The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

Exhibit 6 at 10, 19 (Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020).

28.     Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables infringers to stymie authorities:

> The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.
>                                    . . .
> A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.
>                                    . . .
> Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

Exhibit 6 at 5, 11, 12.

29.     The Defendant Internet Websites intentionally conceal their identities and the full scope of their piracy operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal operations.

30.     Many of the games include notable common features, including, but not limited to, the use of similar text, characters, maps, and/or general images. For some Defendants, these commonalities suggest potential common ownership, partnership or other forms of coordination. Moreover, each Defendant unfairly benefits from anonymously operating in the midst of a swarm

of dozens of other infringers, each individually, and all collectively, violating Plaintiff's registered trademarks and copyrights with impunity. These circumstances indicate that Defendants' infringing actions arise out of the same transaction or occurrence, or series of transactions or occurrences. Further, the Defendants' infringement of Plaintiff's copyright and trademark rights implicates common questions of law and fact.

31.     In addition to operating under multiple fictitious names, Defendants in this case use a variety of other common tactics to evade enforcement efforts that are typically used by defendants in other similar cases against online infringers. U.S. Customs and Border Protection ("CBP") reports that "[t]rade in counterfeit and pirated goods threatens America's innovation economy, the competitiveness of our businesses, the livelihoods of U.S. workers, and, in some cases, national security and the health and safety of consumers." *See* Exhibit 7 at 2, https://www.cbp.gov/trade/priority-issues/ipr. Moreover, the sale and distribution of unlicensed infringing software on the internet is highly prevalent. According to a recent Business Software Alliance report, unlicensed software accounts for as much as 37% of software installed on personal computers around the globe. *See* Exhibit 8 at 1, https://gss.bsa.org/wp-content/uploads/2018/05/2018_BSA_GSS_Report_en.pdf. At the same time, the prevalence of malware in unlicensed infringing software that is sold and distributed online exposes U.S. and global consumers to security and safety risks that result in significant economic harm. According to the Business Software Alliance, the "cost for dealing with malware that is associated with unlicensed software is growing," costing "companies worldwide nearly $359 billion a year." *Id.* at 2.

32.     According to an intellectual property rights seizures statistics report issued by CPB, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal

year 2021 was over $3.3 billion, an increase of 152% over the previous Fiscal Year. *See* Exhibit 9, p. 5 (Intellectual Property Rights Seizure Statistics, Fiscal Year 2021).

33. CBP reports that the vast majority of its intellectual property seizures correspond to smaller international mail and express shipments, such as those used by Defendants. Exhibit 9 at p. 37. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. *Id.* Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. *Id.* at 27. The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult." *Id.* at 23.

34. The Department of Homeland Security ("DHS") has reported that commonly owned and/or interrelated enterprises have many online marketplace profiles that appear unrelated:

> Platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, nor to link one seller profile to other profiles owned by that same business, or by related businesses and owners. In addition, the party that appears as the seller on the invoice and the business or profile that appears on the platform to be the seller, may not always be the same. This lack of transparency allows one business to have many different profiles that can appear unrelated.

Exhibit 6, p. 39 (Combating Trafficking in Counterfeit and Pirated Goods).

35. Further, infringers such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, LLC ("PayPal") accounts, behind layers of payment gateways so that they can continue operation in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore infringers regularly move funds from U.S.-based PayPal accounts to foreign-based bank accounts, such as China-based bank accounts, outside the jurisdiction of this Court.

36.     Plaintiff has been and continues to be irreparably harmed through loss of control over Plaintiff's reputation, goodwill, ability to license and the quality of goods featuring the UbiFun Works. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and content creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
>
> . . .
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.
>
> . . .
>
> Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.
>
> . . .
>
> Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

Exhibit 6 at 4, 8, 11.

37.     Not only are the creators and copyright and trademark owners harmed, the public is harmed as well:

> The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.
>
> ....
>
> The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. <u>This illicit trade must be stopped in its tracks.</u>

Exhibit 6 at 3, 4. (Underlining in original).

38.     For instance, Defendants manufactured, imported, distributed, copied, offered for sale, and/or sold a software game titled "Dekaron Rising" on Defendants Internet Websites in addition to a number of online accounts, including those operated by Cloudflare and OVH Cloud.

39.     On information and belief, on or around December 1, 2022, Defendants posted on their website links to "Download" the game. *See* https://web.archive.org/web/20221201085910/https://dekaron-rising.com/. According to the link, there were multiple patches posted to fix issues such as stability/connection and other bugs.

40.     On information and belief, on or around December 1, 2022, Defendants distributed, copied, offered for sale, sold, and/or distributed copies of "Dekaron Rising" to the Cloudflare network.



41. On information and belief, on or around May 20, 2023, Defendants continued distributing, copying, offering for sale, selling, and/or distributing copies of "Dekaron Rising" to the Cloudflare network, and issued notices that it would be "updating the server with content fixes and bug fixes."



42.     On information and belief, on or around January 20, 2023, Defendants copied, offered for sale, sold, and/or distributed copies of "Dekaron Tempest" to the Cloudflare network, indicating that the website is "under development" and providing links to its Facebook, Instagram, and Discord pages.



43. On information and belief, on or around August 24, 2024, Defendants copied, offered for sale, sold, and/or distributed copies of "Neptune Dekaron" to the OVH cloud network, issuing patch notices to address technical issues. *See* Exhibit 10 for further information regarding the remaining Defendants.



44. On information and belief, Defendants have also copied, offered for sale, sold, and/or distributed copies of infringing UbiFun works on other online accounts registered and/or administered by Defendants, including on Instagram, Discord, and Facebook.

45. Defendants, without any authorization or license, have knowingly and willfully pirated Plaintiff's UbiFun Works in connection with the advertisement, distribution, offering for sale, and sale of illegal products into the United States and Illinois over the internet. Each Defendant Internet Website offers products to the United States, including Illinois, and, on information and belief, each Defendant has offered to sell Infringing Products into the United States, including Illinois.

46. As a result, Defendants have infringed Plaintiff's UbiFun Works. On information and belief, Defendants have deliberately copied, displayed, distributed, reproduced, and/or made derivative works. On information and belief, a non-exhaustive list of the elements Defendants

have infringed include: literal and nonliteral elements of source code, object code, game files, scripts, data structures, database elements, application user interfaces, software sequences, software structures, and software organizations; visual elements including individual images and sprites, character designs (e.g., visual appearances and attributes), character dance steps and corporal expressions, 3D / 2D models, graphical user interfaces (e.g., layouts and designs of menus, icons, screen displays, and other interactive elements), animations, in-game environments (e.g., levels, worlds, and backgrounds), and cinematic cut scenes; audio elements including music, sound effects, voiceovers, and ambient sounds; story scripts, character dialog, and narratives; in-game artwork and illustrations; textual elements (e.g., in-game text, instructions, and dialogue); derivative works; game levels, maps, and mechanics; the unique experience of the game as captured by its substantial similarity; and cinematic works (e.g., motion sequences and interactive storytelling elements).

47. By way of example, as shown below, UbiFun's "Dekaron" software includes a "Monster Armadillo" that appears to have been copied directly by Dekaron Rising from the "Monster Armadillo" that UbiFun developed. The monster's overall figure, its cone face, horns, squares on its arms, brown fur, and horns that flash green in the middle, remain the same. The creative elements associated with UbiFun's character have been present in UbiFun's protected software since at least 2013 and are substantially similarly to those associated with the character found in the UbiFun software.

| "Monster Armadillo" | |
|---|---|
| **UbiFun** | **Dekaron Rising** |

 

48.     By way of another example, as shown below, UbiFun's "Dekaron" software also includes characters that appears to have been copied directly by Neptune Dekaron from the background image that UbiFun developed in 2013. The character of Rose is nearly identical in both games, featuring a woman with blonde hair wearing an ivory dress with her arms crossed. Janne is also identical in both games, featuring a woman with a yellow helmet and crisscross strapless attire, with the garment centered on each of her legs, and knee-high boots. Even the background is extremely similar, down to the brown furniture between them, the small white table with two brown square objects and an indigo bottle and red bottle, a larger brown table with white tablecloth behind them featuring the same assortment of bottles with identical colors, and a blue overhead with purple and white stripes above them, adjacent to a smaller red fabric, and a brown roof above them. The creative elements associated with UbiFun's weapons have been present in

UbiFun's protected software since at least March 2013 and are substantially similarly to those associated with the character found in the UbiFun software.

| "The NPC arrangement of the Armor/Weapon merchant, Rose Janne" | |
|---|---|
| UbiFun | Neptune Dekaron |
| | |

49. Defendants' copying is not limited to UbiFun's characters. In fact, nearly every aspect of the "Dekaron" software contains creative elements that are substantially similar (if not identical) to creative elements in UbiFun's protected software, including by way of example, the

following side by sides included below. For example, as shown in the maps below of UbiFun and Dekaron Tempest, they look almost identical. The development team listed are UbiFun's current employees, including the representative's name, which remains the same.

| "Ardeca Regional Structure" | |
| :---: | :---: |
| **UbiFun** | **Dekaron Tempest** |
|  | |

### Dekaron Rising

"Quest NPC, Iron Blood Kale"

| UbiFun | Dekaron Rising |
| :---: | :---: |



**"Quest NPC, Fionelle [Incar Guardian Knight]"**

| UbiFun | Dekaron Rising |
|---|---|



**"Quest NPC, Joel (Farmer)"**

| UbiFun | Dekaron Rising |
|---|---|



**"Event Icon and Design Structure"**

| UbiFun | Dekaron Rising |
|---|---|



**"Event Composition and Event Details"**



**"UI Structure and Event Icon Usage"**



### Neptune Dekaron

**"Transportation NPC, AlvIn (Teleporter)"**

| UbiFun | Neptune Dekaron |
|---|---|
| | |



**"Loa Castle Regional Structure"**

| UbiFun | Neptune Dekaron |
|---|---|
| | |



**"Fishing NPC Bilardo"**

| UbiFun | Neptune Dekaron |
|---|---|



**"Fishing Mastery from the Shop"**

| UbiFun | Neptune Dekaron |
|---|---|



**"Monster Spider Larva"**

| UbiFun | Neptune Dekaron |
|---|---|



**"Monster Akris"**

| UbiFun | Neptune Dekaron |
|---|---|



**<u>Dekaron Tempest</u>**

**"The NPC Blacksmith, Axion"**

| UbiFun | Dekaron Tempest |
|---|---|



**"Weapon: Short Sword"**

| UbiFun | Dekaron Tempest |
|---|---|



**"Aria NPC [Craftsman] -> Aria [Costume]"**

| UbiFun | Dekaron Tempest |
|---|---|



**"Dead Eye Monster"**

| UbiFun | Dekaron Tempest |
|---|---|



**"Force Mastery Skill"**

| UbiFun | Dekaron Tempest |
|---|---|
|  | |

**"Mailbox"**

| UbiFun | Dekaron Tempest |
|---|---|
|  | |

**<u>Dekaron Olympus</u>**

**"Teleport NPC, Jerome"**

| UbiFun | Dekaron Olympus |
|---|---|



"Monster, Feeble Lizardman"

| UbiFun | Dekaron Olympus |
|---|---|



**"Monster, Skeleton Hunter"**

| UbiFun | Dekaron Olympus |
| --- | --- |



**Dekaron Origin**

**"Denebe Filed NPC, Noire"**

| UbiFun | Dekaron Origin |
|---|---|



**"Denebe Regional Structure"**

| UbiFun | Dekaron Origin |
|---|---|



**"Teleport NPC, Alvin and Mailbox"**



## 2Moons A9 7 Class

**"Ardeca Regional Structure"**

| UbiFun | 2Moons A9 7 Class |
|--------|-------------------|
|  | |

**"Event NPC, Karin"**

| UbiFun | 2Moons A9 7 Class |
|--------|-------------------|



**"Blacksmith NPC, Maximus"**

| UbiFun | 2Moons A9 7 Class |
|---|---|



## Dekaron Void A12

**"Denebe Regional Structure"**

| UbiFun | Dekaron Void A12 |
|---|---|



**"Denebe Filed NPC, Mustafa"**

| UbiFun | Dekaron Void A12 |
|---|---|

 

"Monster, Mantis"

| UbiFun | Dekaron Void A12 |
|--------|------------------|

**Axion 3 Dekaron**

**"Braiken Castle Regional Structure"**

| UbiFun | Axion 3 Dekaron |
|---|---|



**"Guild Master NPC, Blake"**

| UbiFun | Axion 3 Dekaron |
|---|---|



**"Blacksmith NPC, Axion"**

| UbiFun | Axion 3 Dekaron |
|---|---|
|  | |

**Titan's Wrath**

**"Skill / Stat Reset Master NPC, Berks"**

| UbiFun | Titan's Wrath |
|---|---|



**"Mailbox"**

| UbiFun | Titan's Wrath |
|---|---|
|  | |

**"Siege Battle NPC, Leonhart"**

| UbiFun | Titan's Wrath |
|---|---|



## COUNT I
### COPYRIGHT INFRINGEMENT OF UNITED STATES COPYRIGHT REGISTRATIONS (17 U.S.C. §§ 106 and 501)

50.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

51.     At all relevant times, UbiFun is, and has been, the owner of all valid and enforceable rights to the UbiFun Works, which contain copyrightable subject matter under 17 U.S.C. §§ 101 and 501, et seq.

52.     The UbiFun Works have significant value and have been produced at considerable expense.

53.     The UbiFun Works are the subject of valid certificates of copyright registrations for the UbiFun Works, including the Copyright Registrations attached as Exhibits 4-5. UbiFun has complied with the registration requirements of 17 U.S.C. § 411(a) for the UbiFun Works.

54.     Defendants do not have any ownership interest in the UbiFun Works.

55.     Defendants have had access to the UbiFun Works, including via the internet.

56. Without authorization from UbiFun, or any right under the law, Defendants have deliberately copied, displayed, distributed, reproduced and/or made derivative works of the UbiFun Works, as displayed in relation to the Defendant Internet Websites and the corresponding Infringing Products in violation of 17 U.S.C. § 501 and 17 U.S.C. § 106(1) - (3), (5).

57. Defendants' software, images, artwork and derivative works are virtually identical to and/or substantially similar to the UbiFun Works. Such conduct infringes and continues to infringe the UbiFun Works in violation of 17 U.S.C. § 501 and 17 U.S.C. § 106(1) - (3), (5).

58. Defendants reap the benefits of the unauthorized copying and distribution of the UbiFun Works in the form of revenue and other profits that are driven by the sale of Infringing UbiFun Products.

59. The Defendants have unlawfully appropriated UbiFun's protectable expression by taking material of substance and value and creating Infringing UbiFun Products that capture the total concept and feel of the UbiFun Works.

60. Upon information and belief, the Defendants' infringement has been willful, intentional, and purposeful, and in disregard of and with indifference to, UbiFun's rights.

61. The Defendants, by their actions, have damaged UbiFun in an amount to be determined at trial.

62. As a result of each Defendant's infringement of Plaintiff's exclusive rights under copyrights, Plaintiff is entitled to relief pursuant to 17 U.S.C. §504 and to its attorneys' fees and costs pursuant to 17 U.S.C. §505.

63. The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law.

64.     Pursuant to 17 U.S.C. §§502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's copyrights and ordering that each Defendant destroy all unauthorized copies.

## COUNT II
## TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT (15 U.S.C. § 1114)

65.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

66.     Plaintiff is the exclusive owner of US Trademark Registration Nos. 7159507 for the standard character mark "Dekaron Coin," and 7159503 for the standard character mark "Dekaron Token" (collectively, the "Asserted Trademarks"). The Asserted Trademarks protect Plaintiff's rights to the Dekaron name and related Dekaron designs. Copies of Plaintiff's registrations for the Asserted Trademarks are attached as Exhibits 1-2. The registrations for the Asserted Trademarks are in full force and effect.

67.     Without authorization, and, upon information and belief, with knowledge of Plaintiff's rights to the Asserted Trademarks, Defendants have manufactured, advertised, offered for sale, sold, distributed, imported, and/or exported infringing products bearing the Asserted Trademarks, or marks highly and/or confusingly similar to the Asserted Trademarks.

68.     Defendants have used marks that are copies and/or colorable imitations of the Asserted Trademarks in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive under 15 U.S.C. § 1114.

69.     Upon information and belief, Defendants were on actual notice of Plaintiff's exclusive rights to the Asserted Trademarks. In addition, Plaintiff's federal registrations put Defendants on constructive notice of Plaintiff's exclusive rights in the Asserted Trademarks.

70.     Defendants' actions are likely to cause, and have caused, confusion, mistake, or deception as to the source or sponsorship of the infringing products. As a result of Defendants' unauthorized use of Plaintiff's Asserted Trademarks and/or trademarks that are identical or highly and/or confusingly similar to Plaintiff's federally registered trademarks, the public is likely to believe that Defendants' goods have been manufactured and/or approved by Plaintiff.

71.     Such unauthorized use of the Asserted Trademarks falsely represents Defendants as being legitimately connected with and/or authorized by Plaintiff, and places beyond Plaintiff's control of its own reputation and ability to control the use of the Asserted Trademarks and the quality of the products bearing those marks.

72.     Defendants' infringement of the Asserted Trademarks is willful, intended to reap the benefit of the goodwill of Plaintiff, and violates the Lanham Act, 15 U.S.C. § 1114.

73.     Defendants' actions have caused, and unless enjoined by this Court, will continue to cause, Plaintiff to sustain irreparable damage, loss, and injury.

74.     Plaintiff has no adequate remedy at law.

### COUNT III
### COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

75.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

76.     Plaintiff has a federal pending trademark registration, Serial No. 98561698 for the standard character mark, "Dekaron" ("the Trademark Application."). A copy of Plaintiff's Trademark Application is attached as Exhibit 3.

77.     This claim arises under the common law of this State relating to trademark infringement and unfair competition. This Court has jurisdiction over the subject matter of this claim pursuant to the provisions of 28 U.S.C. § 1338(b), this being a claim of unfair competition

joined with a substantial and related claim under the Trademark Laws of the United States, an

under 28 U.S.C. § 1367.

78.     Upon information and belief, Defendant's conduct is willful, deliberate, intentional

and in bad faith.

79.     Plaintiff has no adequate remedy at law. The conduct of Defendant has caused and,

if not enjoined, will continue to cause, irreparable damage to Plaintiff's rights in and to its

trademarks, and to Plaintiff's businesses, reputations, and goodwill.

## COUNT IV
## FALSE ADVERTISING UNDER THE LANHAM ACT 41 U.S.C. § 1125(a)(1)

80.     Plaintiff repeats and incorporates by reference herein its allegations contained in

the above paragraphs of this Complaint.

81.     Upon information and belief, Defendant intentionally produced its infringing game,

naming it Dekaron, which was misleading and had the capacity to deceive.

82.     Upon information and belief, Defendant's conduct is willful, deliberate, intentional

and in bad faith.

83.     Plaintiff has no adequate remedy at law. The conduct of Defendant has caused and,

if not enjoined, will continue to cause, irreparable damage to Plaintiff's rights in and to its

trademarks, and to Plaintiff's businesses, reputations, and goodwill.

## COUNT V
## COUNTERFEITING

84.     Plaintiff repeats and incorporates by reference herein its allegations contained in

the above paragraphs of this Complaint.

85.     On information and belief, Defendant markets and offers for sale the Infringing

Products to its customers with the knowledge and intent that the Infringing Products will be put to

use by their customers in marketing, offering for sale, selling, and distributing the counterfeit games, constituting wrongful counterfeiting acts in violation of 15 U.S.C. § 1114.

86.     Upon information and belief, Defendant's conduct is willful, deliberate, intentional and in bad faith.

87.     Plaintiff has no adequate remedy at law. The conduct of Defendant has caused and, if not enjoined, will continue to cause, irreparable damage to Plaintiff's rights in and to its trademarks, and to Plaintiff's businesses, reputations, and goodwill.

## <u>COUNT VI</u>
## FEDERAL UNFAIR COMPETITION

88.     Plaintiff repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

89.     Defendant's acts are likely to cause confusion or mistake, or to deceive as to Defendant's affiliation, connection, or association with Plaintiff, or as to the origin, sponsorship, or approval of Defendant's goods. Defendant's acts constitute unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

90.     Upon information and belief, Defendant's conduct is willful, deliberate, intentional, and in bad faith, making this an exceptional case.

91.     Plaintiff has been, and will continue to be, damaged by Defendant's infringement in an amount to be determined at trial

92.     Plaintiff has no adequate remedy at law. The conduct of Defendant has caused and, if not enjoined, will continue to cause, irreparable damage to Plaintiff's rights in and to its trademarks, and to Plaintiff's businesses, reputations, and goodwill.

## <u>JURY DEMAND</u>

93.     Plaintiff demands trial by jury on all matters triable by the jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

    a.   Using the UbiFun Works or any reproductions, copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized UbiFun Product or is not authorized by Plaintiff to be sold in connection with the UbiFun Works;

    b.   passing off, inducing, or enabling others to sell or pass off any product or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the UbiFun Works;

    c.   further infringing the UbiFun Works and damaging Plaintiff's goodwill;

    d.   delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not authorized by Plaintiff to be sold or offered for sale, and which directly use the UbiFun Works, and which are derived from Plaintiff's copyrights in the UbiFun Works; and

    e.   using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Internet Websites, or any other online account that is being used to sell products or inventory not authorized by Plaintiff which are derived from Plaintiff's copyrights in the UbiFun Works;

2) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online websites, social media platforms,

Facebook, YouTube, LinkedIn, Twitter, internet search engines such as Google, Bing, and Yahoo, web hosts for the Defendant Internet Websites, shall:

    a.  disable and cease providing services for any accounts through which Defendants engage in the sale of products not authorized by Plaintiff which reproduce the UbiFun Works or are derived from the UbiFun Works, including any accounts associated with the Defendants listed on Schedule A;

    b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products not authorized by Plaintiff which are derived from the UbiFun Works; and

    c.  take all steps necessary to prevent links to the Defendant accounts identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant accounts from any search index;

    3)  For Judgment in favor of Plaintiff against Defendants that they have: a) willfully infringed Plaintiff's rights in Plaintiff's federally registered copyrights pursuant to 17 U.S.C. §501; and b) otherwise injured the business reputation and business of Plaintiff by Defendants' acts and conduct set forth in this Complaint;

    4)  For Judgment in favor of Plaintiff against Defendants for actual damages or statutory damages pursuant to 17 U.S.C. §504, at the election of Plaintiff, in an amount to be determined at trial;

    5)  That Plaintiff be awarded Plaintiff's reasonable attorneys' fees and costs; and

    6)  Award any and all other relief that this Court deems just and proper.

DATED: April 2, 2025                Respectfully submitted,

                                      **NIXON PEABODY LLP**

*/s/ Erica J. Van Loon*
Erica J. Van Loon (CA Bar No. 227712)
300 S. Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
evanloon@nixonpeabody.com
T: +1 213.629.6031

Matthew A. Werber (IL Bar No. 6287658)
70 W. Madison St., Suite 5200
Chicago, IL 60602
mwerber@nixonpeabody.com
T: +1 (312) 977-4400

Peter Krusiewicz (IL Bar No. 6342444)
70 W. Madison, Suite 5200
Chicago, IL 60602
pkrusiewicz@nixonpeabody.com
T: +1 312.977.4473

**ATTORNEYS FOR PLAINTIFF**